**No. 23-2073**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

JOHN DOE 2,
*Plaintiff-Appellant,*

v.

NORTH CAROLINA STATE UNIVERSITY,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Eastern District of North Carolina
Case No. 5:23-cv-216
The Honorable Louise W. Flanagan

---

### BRIEF OF PLAINTIFF-APPELLANT JOHN DOE 2

---

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Kerstin W. Sutton
KERSTIN WALKER SUTTON PLLC
3215 Deerchase Wynd
Durham, NC 27712
(919) 698-9555
kws@kwsutton.com

Alexandra Z. Brodsky
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................i

JURISDICTIONAL STATEMENT........................................................ 1

INTRODUCTION............................................................................ 2

STATEMENT OF ISSUES ................................................................ 3

STATEMENT OF THE CASE ............................................................ 4

I.    Factual Background........................................................... 4

    A.    The University learns Murphy is engaged in a pattern of sexual abuse. ..................................................... 4

    B.    Murphy abuses John, whose access to educational benefits suffers. .............................................................. 6

    C.    The University fires Murphy.................................... 9

    D.    John learns he was abused, and that the University caused the abuse.............................................. 11

II.    Procedural Background ................................................... 12

SUMMARY OF ARGUMENT.......................................................... 13

STANDARD OF REVIEW ............................................................. 15

ARGUMENT................................................................................ 16

I.    John Doe sufficiently alleged that the University had actual notice............................................................................ 17

    A.    A school may receive actual notice from a report to an appropriate person that describes sexual harassment or provides other information that ensures the appropriate person must know the risk of sexual harassment................ 17

    B.    Coach Findley's report provided the University actual notice. ....................................................................... 19

II.    The District Court erred in concluding John did not sufficiently plead the University had actual notice. ........................................ 24

CONCLUSION ........................................................................... 30

CERTIFICATES ......................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baynard v. Malone,*
  268 F.3d 228 (4th Cir. 2001)..........................................*passim*

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................... 15

*C.S. v. Madison Metro. Sch. Dist.,*
  34 F.4th 536 (7th Cir. 2022) (en banc)......................................... 27, 28

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999)..................................................... 13, 16

*Doe v. Fairfax Cnty. Sch. Bd.,*
  1 F.4th 257 (4th Cir. 2021) ..........................................*passim*

*Doe v. N.C. State Univ.,*
  No. 5:23-CV-044, 2023 WL 5916453
  (E.D.N.C. Sept. 11, 2023) ............................................. 13

*Doe v. Sch. Bd. of Broward Cnty.,*
  604 F.3d 1248 (11th Cir. 2010)................................ 18, 19, 27

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
  637 F.3d 435 (4th Cir. 2011)............................................. 15, 16, 24, 29

*Escue v. N. Okla. Coll.,*
  450 F.3d 1146 (10th Cir. 2006)........................................... 26

*Forth v. Laramie Cnty. Sch. Dist. No. 1,*
  85 F.4th 1044 (10th Cir. 2023) ........................................ 23, 27

*Gebser v. Lago Vista Indep. Sch. Dist.,*
  524 U.S. 274 (1998).................................................. 17, 28

*Jennings v. Univ. of N.C.,*
  482 F.3d 686 (4th Cir. 2007) (en banc) .............................. 17

*Koon v. North Carolina*,
   50 F.4th 398 (4th Cir. 2022) ......................................................*passim*

*Locke v. N.C. State Univ.*,
   No. 5:22-CV-344, 2023 WL 5916455
   (E.D.N.C. Sept. 11, 2023) .................................................................. 13

*Murrell v. Sch. Dist. No. 1, Denver*,
   186 F.3d 1238 (10th Cir. 1999).......................................................... 19

*Papelino v. Albany Coll. of Pharm.*,
   633 F.3d 81 (2d Cir. 2011) ................................................................ 20

*United States v. Chambers*,
   642 F.3d 588 (7th Cir. 2011).............................................................. 21

*United States v. Engle*,
   676 F.3d 405 (4th Cir. 2012)........................................................ 21, 22

**Statutes**

20 U.S.C. § 1681. ...................................................................................... 1

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

28 U.S.C. § 1343 ........................................................................................ 1

**Other Authorities**

34 C.F.R. § 106.30(a) .............................................................................. 20

85 Fed. Reg. 30,026, 30,056, 30,268 (2020) .......................................... 29

*Grooming, Know the Warning Signs*, Rape, Abuse & Incest
   National Network (July 10, 2020),
   https://www.rainn.org/news /grooming-know-warning-
   signs (last accessed Jan. 30, 2024)............................................. 21, 22

## JURISDICTIONAL STATEMENT

John Doe 2 filed suit against North Carolina State University under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. The District Court had subject-matter jurisdiction under 28 U.S.C. § 1343 and 28 U.S.C. § 1331. The District Court granted the University's motion to dismiss on September 11, 2023. JA 45. John timely filed a notice of appeal on October 11, 2023. JA 46-47. This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

When a school learns that it employs a serial sexual predator, the duty to protect its students is a no brainer. That is what the law, and basic ethics, require. But when North Carolina State University received a report that athletic trainer Rob Murphy was "engaging in sexual grooming of male student-athletes," it retained and, later, promoted him. Sure, the athletic department reassigned some of Murphy's duties to reduce his contact with male student-athletes. But that reassignment did not cut off his access to those athletes. Because of the University's minimalist response, Murphy had the opportunity to abuse other students, including John, all under the guise of providing medical care. The University only terminated Murphy years later after the effects of his abuse had stifled John's participation in the sport he loved and impaired his education.

Despite this abject failure, the District Court dismissed John's Title IX complaint on the grounds that it did not allege the University had actual notice of Murphy's abuse. In doing so, the District Court failed to recognize that John alleged that the University had received a report describing sexual harassment or, at the very least, that the University must have known—and indeed did know—about the risk Murphy posed. These

2

errors stemmed from the District Court's failure to draw inferences in John's favor and a misstatement of the legal standard. This Court should recognize the sufficiency of John's allegations and the reasonable inferences therefrom, and should reverse and remand for John's case to proceed to discovery.

## STATEMENT OF ISSUES

When a plaintiff alleges that an appropriate person at a school received a report that a school employee was engaged in "sexual grooming" of students, and that the school subsequently reassigned that employee, has the plaintiff sufficiently alleged that the school received actual notice of that employee's ongoing sex-based harassment for purposes of a Title IX claim?

## STATEMENT OF THE CASE

I.  **Factual Background**

  A.  **The University learns Murphy is engaged in a pattern of sexual abuse.**

North Carolina State University, located in Raleigh, is the largest school within the University of North Carolina's sixteen-campus system. JA 7 (Compl. ¶ 8). In 2011, the University hired Robert Murphy, a licensed athletic trainer, as Director of Sports Medicine. JA 10-11 (Compl. ¶¶ 20, 22-23). Murphy's job was "to provide direct oversight and coordination of day-to-day athletic training, medical services operations, and sports medicine facility management for [the University's twenty-three] NCAA Division I intercollegiate sports teams." JA 11 (Compl. ¶ 24). Because of that role, Murphy had the power to determine which student-athletes were allowed to compete on behalf of the University. JA 11 (Compl. ¶ 25).

Murphy used this power over student-athletes, and his position as a medical authority, to abuse young men. *See* JA 21, 29-30, 31 (Compl. ¶¶ 57, 82, 87-88). For example, under the guise of providing a medical treatment, Murphy would unnecessarily touch student-athletes' genitals with his bare hands. *See* JA 12-14, 17, 21 (Compl. ¶¶ 28-48, 55, 57). He

was able to do this because, contrary to prevailing practices, he instructed male student-athletes to remove even their underwear while he massaged their thigh and groin areas. JA 29 (Compl. ¶ 82). He also conducted an elaborate and unnecessary self-designed "drug testing" protocol that required male student-athletes to undress, place the front hem of their shirt in their mouth, and turn in a circle while Murphy stared at their genitals. *See* JA 18, 30 (Compl. ¶¶ 55, 82).

The University's head men's soccer coach, Kelly Findley, was worried. *See* JA 16 (Compl. ¶ 55). Sometime in early 2016, Coach Findley told the University's Senior Associate Athletic Director, Sherard Clinkscales, that he believed Murphy was "engaging in . . . sexual grooming of male student-athletes." *Id.* The next year, the University changed Murphy's duties to be more "administrative," removing him from his role as "designated athletic trainer for certain men's teams." *Id.* The University did not, however, stop Murphy from interacting with male student-athletes, whom he continued to abuse. *See id.*; JA 25-26 (Compl. ¶ 72). In 2018, the University promoted Murphy to be Associate Athletic Director. JA 16 (Compl. ¶ 55).

5

### B. Murphy abuses John, whose access to educational benefits suffers.

While Murphy remained on staff, University coaching staff recruited John, who enrolled as a student-athlete in 2020. JA 9-10 (Compl. ¶¶ 17-18). When he started at the University, John "executed and submitted . . . paperwork required of incoming student-athletes participating in [University] athletics." JA 10 (Compl. ¶ 19). In one of these forms, John "agreed . . . to 'comply with directions' of coaches and [s]ports [m]edicine staff." *Id.*

In early 2021, while a member of his University athletic team,[1] John "experienced left hip and groin pain." JA 12 (Compl. ¶¶ 26-27). John reported the pain to Murphy, who "suggested treating [John's] injury with targeted sports massage on his left hip flexor groin area." JA 12 (Compl. ¶¶ 27-28). That "treatment," it turned out, was merely a pretext for sexual abuse.

Murphy arranged to meet with John "in the training room when no other athletes, trainers[,] or staff were present." JA 12 (Compl. ¶ 29). Once alone, Murphy directed John to remove his underwear, and then to

---

[1] This Brief, like the Complaint, leaves John's sport unmentioned to help preserve his anonymity.

lie down on a training table. JA 12 (Compl. ¶¶ 30, 33). John "did not feel he could question Murphy and complied with his directions." JA 12 (Compl. ¶ 32). "Murphy [then] used his bare hands to massage the left side of [John's] groin area." JA 12 (Compl. ¶ 34). During the entire "massage," Murphy made "continuous skin-to-skin contact with [John's] genitals," touching and moving John's penis. JA 12-13 (Compl. ¶¶ 34-35). Murphy's contact with John's genitals was not medically necessary. JA 14 (Compl. ¶ 48). And Murphy never asked John if he was okay with the touching. *Id.*

Murphy's touching of John's penis made the student uncomfortable. JA 13 (Compl. ¶ 41). But John trusted that Murphy, a licensed medical professional, "was acting in his best medical interest." JA 10-11, 13 (Compl. ¶¶ 22, 46). After all, Murphy was the University's Director of Sports Medicine, whose instructions student-athletes were required to obey, and who had the ultimate authority to decide which players could compete. *See* JA 10, 11 (Compl. ¶¶ 19, 25). So, when John's hip and groin pain continued, he again reported it to Murphy, and submitted to another "sports massage." JA 13 (Compl. ¶¶ 43-44). Once again, Murphy directed

7

John to undress and engaged in medically unnecessary touching of John's "penis with his bare hands and fingers." JA 13-14 (Compl. ¶¶ 45-48).

Murphy's touching of John's genitals during the "massages" was not only medically unnecessary but ran afoul of multiple norms of sports medicine. "[E]very professional training" instructs trainers to "[a]void[ ] skin-to-skin contact with student-athletes' genitals." JA 17 (Compl. ¶ 55). When a treatment risks contact between a trainer and a student's penis, trainers will provide the student with a towel to cover and move his genitals out of the way. *Id.* And "[d]irecting student-athletes to remove their underwear . . . is not an acceptable practice for a licensed athletic trainer." *Id.* Instead, trainers apply treatments over student-athletes' underwear. *Id.*

After the second "massage," John wondered whether "Murphy's skin-to-skin contact with his genitals was a professionally acceptable athletic training technique for a licensed athletic trainer." JA 14 (Compl. ¶ 49). But John tried to brush his concerns aside because he still trusted Murphy given his "elevated professional stature" at the University and the University's requirement that student-athletes "follow Murphy's directions." JA 14 (Compl. ¶ 50).

Even with his attempts to reconcile Murphy's abuse in his mind, John still suffered—not only mentally and physically, but in his access to educational benefits. Because of John's understandable reaction to the abuse, Murphy effectively stifled John's athletic career and standing with the University team. John avoided Murphy through the rest of his time as a student at the University, *see* JA 14-15 (Compl. ¶¶ 51-52), but because of Murphy's role, this meant that John reduced his use of athletic training facilities. *See* JA 15 (Compl. ¶ 52). Because he associated Murphy's abuse with playing his sport, he also found less enjoyment in "the sport he had spent a good portion of his life mastering." *Id.* And the harm Murphy visited upon him went beyond athletic involvement and performance; after Murphy's abuse, John had trouble focusing, leading to diminished academic performance, too. *Id.*

## C. The University fires Murphy.

Unbeknownst to John, Benjamin Locke, another former student-athlete abused by Murphy, reported the trainer to the University on or before January 21, 2022. *See* JA 17 (Compl. ¶ 55). The University suspended Murphy in January 2022 and conducted an investigation into Benjamin's complaint that Murphy had abused him and at least two

other male student-athletes. *See* JA 16-17, 23, 31 (Compl. ¶¶ 55, 62, 87). During the investigation, "Murphy admitted to the [University] investigators that he had touched [Benjamin's] penis and testicles with his bare hands," and attributed this conduct to a "personal preference" for treating student's "bare skin." JA 18 (Compl. ¶ 55).

On June 7, 2022, the University's Title IX Coordinator told Benjamin that Murphy was no longer working at the University. JA 19 (Compl. ¶ 57). Ten days later, the University sent Benjamin a letter explaining that the University would have substantiated his allegations against Murphy were Murphy still employed by the University. *Id.* Soon after, the Title IX Coordinator told Benjamin that the University had fired Murphy for reasons unrelated to the sexual abuse investigation. *Id.* The next month, the University allowed Benjamin to review, briefly, the University's investigative report, which concluded that Benjamin's allegations were true and that "Murphy's conduct toward" him was "unwelcome and of a sexual nature" rather than "medically necessary." JA 21 (Compl. ¶ 57).

### D. John learns he was abused, and that the University caused the abuse.

"In early 2022," John learned that the University had suspended Murphy "over allegations of sexual abuse." JA 23 (Compl. ¶ 62). After spending years trying not to think about Murphy, John began reflecting on his experiences with the trainer at the University. JA 23 (Compl. ¶¶ 61, 63). Finally, he was able to recognize he had been abused, and see the connection between the abuse and the subsequent "feelings of fear, shame, humiliation, guilt, self-blame, self-doubt, distrust, anger, confusion, and sadness" he had felt. *See* JA 23 (Compl. ¶ 64).

In September 2022, John learned that Benjamin had filed a civil suit against the University and Murphy. *See* JA 6-7, 15, 16 (Compl. ¶¶ 3, 53, 55). A few months later, in February 2023, John learned that a second victim, "John Doe," had filed a similar suit against the University. *See* JA 6-7, 15 (Compl. ¶¶ 3, 54).

From these complaints, John learned, for the first time, that the University had enabled Murphy's serial abuse. *See* JA 16-19 (Compl. ¶¶ 55, 57). He learned that Murphy had sexually abused other male student-athletes at the University, that Coach Findley had reported Murphy's "sexual grooming" to the Senior Associate Athletic Director,

11

Sherard Clinkscales, in early 2016. JA 16 (Compl. ¶ 55). And he learned that the University had subsequently changed Murphy's responsibilities to reduce his contact with male student-athletes. *Id.*

## II.    Procedural Background

In April 2023, John filed a lawsuit against the University. JA 5-36. John alleged that the University was liable under Title IX for its deliberate indifference to sexual harassment, leading to him to be abused by Murphy. JA 27-34 (Compl. ¶¶ 75-103). On September 11, 2023, the District Court granted the University's motion to dismiss John's initial complaint. JA 45. The District Court did so without granting leave to amend, and it directed the Clerk to close the case the same day, which the Clerk did. JA 4, 44.

In dismissing the complaint, the Court assumed without deciding that Senior Associate Athletic Director Clinkscales was an official with corrective authority whose knowledge could be attributed to the University. JA 42 n.4. Yet it concluded that Coach Findley's report to Clinkscales that Murphy was "sexual[ly] grooming" student-athletes, and the University's subsequent decision to reduce Murphy's contact with students, did not give rise to a plausible inference that the

University had actual notice that Murphy had engaged in sexual harassment of student-athletes. JA 42-44.

John timely noticed this appeal on October 11, 2023. JA 46-47.[2]

## SUMMARY OF ARGUMENT

A recipient of federal funding may be liable in money damages under Title IX where it is "deliberately indifferent to sexual harassment, of which [it has] actual knowledge, [and] that harassment is so severe, pervasive, and objectively offensive that it . . . deprive[s] the victims of access to the educational opportunities or benefits provided by the school." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). Here, the District Court dismissed John's complaint for a

---

[2] The district court dismissed Benjamin's and the other John Doe's Title IX claims against the University on the same basis it dismissed this case. *See Locke v. N.C. State Univ.*, No. 5:22-CV-344, 2023 WL 5916455, at *4 (E.D.N.C. Sept. 11, 2023); *Doe v. N.C. State Univ.*, No. 5:23-CV-044, 2023 WL 5916453, at *4-5 (E.D.N.C. Sept. 11, 2023). Benjamin's suit continues at the district court against other defendants, and he has moved for a certificate of appealability on his Title IX claim. *See* Mot. for Certificate of Appealability, *Locke v. Murphy*, No. 5:22-CV-344 (E.D.N.C. Oct. 16, 2023), ECF No. 48. That motion is pending as of the filing of this brief.

purported failure to properly allege actual notice of Murphy's abuse to an appropriate person at the University. That was error.

John alleged that Coach Findley reported to Senior Associate Athletic Director Clinkscales, an appropriate person whose knowledge is attributable to the University, that Murphy was engaging in "sexual grooming" of male student-athletes. JA 16 (Compl. ¶ 55). A reasonable official would construe a report of "sexual grooming" as a report alleging sexual abuse prohibited by Title IX. And even if a reasonable official would not construe that report as alleging sexual abuse, the very nature of grooming—conduct designed to prepare a victim for abuse and conceal it from authorities—would still make the ongoing risk to students unavoidably obvious. As alleged, a University official not only must have known about the risk Murphy posed to students' federal rights—he in fact did know, as demonstrated by the University's half-hearted attempts to constrain Murphy's access to potential victims in the wake of Coach Findley's report.

In deciding otherwise, the District Court failed to draw inferences in John's favor, minimizing Coach Findley's report of "sexual grooming" of multiple student-athletes and the import of the University's

14

subsequent (inadequate) attempts to curtail Murphy. The District Court also formulated an incorrect version of the actual notice standard contrary to controlling precedent. Under the District Court's view of the law, the only way a school can receive actual notice is through a report of a recent incident of misconduct that itself constitutes sexual abuse. If that were right, a school would have no obligation under Title IX to prevent sexual abuse of a student that it knows is coming based on obvious red flags that officials understand demonstrate an imminent danger, even if those red flags are not themselves acts of sexual abuse. That is not the law, nor should it be.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of a defendant's motion to dismiss. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At this early stage, the Court "accept[s] as true all of the factual allegations contained in the complaint." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). And the Court

15

"draw[s] all reasonable inferences in favor of the plaintiff." *Id.* (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)).

## ARGUMENT

A school may be liable under Title IX for its deliberate indifference to sexual harassment of which it has actual notice. *Davis ex rel. La-Shonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). In his complaint, John Doe alleged that the head coach of the University soccer team informed the senior associate athletic director that he believed that Murphy was "engaging in . . . sexual grooming of male student-athletes." JA 16 (Compl. ¶ 55). That report provided the school actual notice.

I.   **John Doe sufficiently alleged that the University had actual notice.**

    A. **A school may receive actual notice from a report to an appropriate person that describes sexual harassment or provides other information that ensures the appropriate person must know the risk of sexual harassment.**

A school has actual notice of all information known to any "official who has authority to address the alleged harassment and to institute corrective measures." *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 264 (4th Cir. 2021). These officials are known as "appropriate person[s]." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Often, an appropriate person receives actual notice from a report describing misconduct by the harasser at issue. In a so-called "post-assault" case, in which a plaintiff alleges that a school responded with the deliberate indifference to the abuse he suffered, this report usually describes the harassment to which the plaintiff was subjected. *See, e.g.*, *Fairfax*, 1 F.4th at 268-71; *Jennings v. Univ. of N.C.*, 482 F.3d 686, 700-01 (4th Cir. 2007) (en banc). In "pre-assault" cases like John's, where a plaintiff faults the defendant for failing to prevent him from being abused in the first place, a school may have actual notice based on an earlier report that, for example, the harasser in question has abused other

17

students. *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1257-58 (11th Cir. 2010); *Baynard v. Malone*, 268 F.3d 228, 238 n.9 (4th Cir. 2001). Because, in a pre-assault case, the school's putative liability stems from its deliberate indifference *prior* to the plaintiff's abuse, the question is what it knew before the abuse occurred.

In assessing whether a report provides a school with actual notice, this Court "asks whether . . . a reasonable official would construe [the complaint] as alleging misconduct prohibited by Title IX." *Fairfax*, 1 F.4th at 268. For purposes of the notice element, it does not matter whether the appropriate person believed the report or substantiated it. *Id.* at 267-68.

In some cases, even where a report does not describe conduct that, on its own, constitutes sexual harassment, the report may nonetheless provide the school actual notice. As this Court recently described in a disability discrimination case adopting Title IX's standard, a court may infer knowledge of "dangers to federal rights" where "a risk was so 'obvious' that an official must have had knowledge." *Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022). The question is "whether it was so obvious they *must* have known, instead of whether it was so obvious they

18

*should* have known," which would constitute constructive notice. *Id.* While obviousness may be apparent from the face of a report, allegations that the appropriate person "actually dr[ew] the damning inference" will also suffice to plead actual notice. *Id.*

## B. Coach Findley's report provided the University actual notice.

1. Here, John has adequately pleaded that an appropriate person at the University received a report that alleged sexual harassment. First, Senior Associate Athletic Director Clinkscales is an appropriate person—and if he is not, he told an official who is. After Clinkscales received the report, the athletics department redesigned Murphy's job duties, reducing his contact with male student-athletes. *See supra* p. 5. Adjusting job responsibilities to reduce the risk of harassment is an exercise of corrective authority. *See Broward*, 604 F.3d at 1255 (holding school official was an appropriate person because he could "place . . . 'restrictions'" on a teacher in response to a harassment complaint); *Baynard*, 268 F.3d at 239 (explaining a power to "transfer" school staff is the mark of an appropriate person); *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1247 (10th Cir. 1999) (explaining that "transferring" a harasser to reduce contact with the victim is a mark of corrective authority). The complaint

gives rise to a fair inference that Clinkscales possessed that corrective authority, given the connection between the report and Murphy's subsequent reassignment, as well as Clinkscales' seniority within the department.[3] And if Clinkscales did not possess that authority, the complaint at the very least gives rise to an inference that he told someone who did. After all, *someone* at the University adjusted Murphy's responsibilities after Coach Findley's report.

2. "[A] reasonable official would construe" Coach Findley's report to Clinkscales "as alleging misconduct prohibited by Title IX." *Fairfax*, 1 F.4th at 268. Unwelcome sexual conduct, including sexual assault, constitutes prohibited sexual harassment. 34 C.F.R. § 106.30(a); *see Fairfax*, 1 F.4th at 270. Coach Findley reported that Murphy was "engaging in . . . sexual grooming of male student-athletes." JA 16 (Compl. ¶ 55). That is, Findley's report alleged that Murphy was undertaking "sexual" conduct with multiple students, *id.*—students over whom Murphy exercised significant authority, JA 11 (Compl. ¶¶ 24-25); *see also Papelino v. Albany*

---

[3] As Senior Associate Athletic Director, Clinkscales had seniority over multiple levels of athletic department management. *See, e.g.*, JA 16 (Compl. ¶ 55) (illustrating the athletics department encompasses at least three levels—Senior Associate Athletic Director, Associate Athletic Director, and, below that, Director of Sports Medicine).

*Coll. of Pharm.*, 633 F.3d 81, 89-90 (2d Cir. 2011) (holding that a report to a school of a professor making "sexual overtures" to students could put the school on actual notice).

And by characterizing the conduct as "grooming"—conduct defined by its role in sexual abuse—the report underscored that the conduct was predatory. *See Grooming, Know the Warning Signs*, Rape, Abuse & Incest National Network (July 10, 2020), https://www.rainn.org/news /grooming-know-warning-signs (last accessed Jan. 30, 2024) [hereinafter "RAINN"] ("Grooming [is defined as] manipulative behaviors that the abuser uses to gain access to a potential victim, coerce them to agree to the abuse, and reduce the risk of being caught."); *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012) (discussing how abusers engage in "grooming" for child sex abuse, including by exposing children to sexual material); *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011) (noting "sexual abuse . . . is often carried out through a period of grooming"). Viewed in the light most favorable to John, Coach Findley's report

to Clinkscales that Murphy was engaging in predatory sexual conduct is a report of sexual harassment.

3. Even if the District Court were correct that Coach Findley's report did not, on its face, allege sexual harassment, JA 39-40, the report still sufficed to provide the University actual notice. "Grooming" activities that do not constitute abuse themselves serve to facilitate abuse by priming the victim for exploitation and concealing the abuse from authorities. *See, e.g.*, *Engle*, 676 F.3d at 412; RAINN, *supra*. A report of grooming, then, is a report that abuse has already occurred or that a person is "prepar[ing] the [victim] for [abusive] sexual activity," *Engle*, 676 F.3d at 412 (quoting *Chambers*, 642 F.3d at 593). Accordingly, Coach Findley's report made the "dangers to federal rights"—in this case, sexual abuse in violation of Title IX—"so 'obvious'" that Clinkscales, and anyone else to whom he passed along the report, "must have had knowledge." *Koon*, 50 F.4th at 407.

4. Indeed, the complaint gives rise to an inference that Clinkscales (or another appropriate person) "actually dr[ew] the damning inference," *id.*, that Murphy was sexually abusing male student-athletes. That inference arises from what the University did after receiving Coach Findley's

report: It changed Murphy's job. The University limited Murphy's work requiring direct contact with male student-athletes in favor of more administrative tasks, reducing his opportunities for contact with the very student-athletes whom Coach Findley had reported were at risk. JA 16 (Compl. ¶ 55). That is, the University revised Murphy's duties in a manner seemingly designed to lower the risk—albeit clearly not enough—that Murphy would sexually abuse more male student-athletes.

Those allegations give rise to a reasonable inference that senior University administrators understood, in the wake of the grooming report, that Murphy was sexually abusing male student-athletes. *See Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1049-50, 1064-65 (10th Cir. 2023) (holding school official's attempts at corrective action, after receiving reports of a teacher's inappropriate conduct with a student, gave rise to inference the official "understood the substantial risk of abuse" the teacher "posed"). To reason by analogy: If a hospital received a report that opioid vials were going missing while a certain nurse was on call, and the hospital then changed that nurse's job to reduce her access to those drugs, the hospital's actions would raise an inference that it "actually dr[ew] the

damning inference" that the nurse was stealing opioids. The same logic applies here.

## II. The District Court erred in concluding John did not sufficiently plead the University had actual notice.

In concluding that John had not adequately pleaded actual notice, the District Court misread this Court's precedent and failed to draw inferences in John's favor, as required on a motion to dismiss. *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.

1. The District Court assumed, without analysis, that Coach Findley's report did not allege sexual harassment. JA 42. As explained above, that is incorrect. *See supra* Section I.B.2. Drawing all inferences in John's favor, a reasonable official would understand a report of "sexual grooming" to be a report of sexual harassment. *See id.*

2. The District Court also erred when it conflated what is sufficient for actual notice with what is necessary. According to the opinion below, a school may only have actual notice when it receives a report of a recent "'incident' of sexual harassment." JA 42 (quoting *Fairfax,* 1 F.4th at 267). Such an "incident" report certainly suffices to provide actual knowledge, as this Court confirmed in *Doe v. Fairfax County School Board*, 1 F.4th at 267. And, as noted, that is often how plaintiffs establish actual notice

in post-assault cases like *Fairfax*. *See supra* pp. 17-18. But that kind of report is not the only way to establish actual notice—a feature of the law that is especially important for pre-assault cases like this one. *See supra* Section I.A. A school may also have actual notice where a risk of a federal rights violation is "so 'obvious' that an official must have had knowledge." *Koon*, 50 F.4th at 407.

To be sure, not all information indicating a "potential" for sexual abuse, *Baynard*, 268 F.3d at 238, will suffice to demonstrate a school "must have had knowledge" of a "danger[] to federal rights," *Koon*, 50 F.4th at 407. The District Court based its ruling in significant part on *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001), as described in *Fairfax*. JA 41. In *Baynard*, a principal learned that a current student had sat on a teacher's lap in a classroom and received a report from a former student that he had been sexually abused by the teacher fifteen years earlier. 268 F.3d at 233. The principal later testified that she did not "perceive[ ] a danger to [the teacher's] students" until later hearing about the teacher's child abuse from another source. *Id.* On summary judgment, this Court recognized that the principal "*should* have been aware of the *potential* for [sexual] abuse" at an earlier point. *Id.* at 238 (first emphasis added). But

25

that was not enough for actual knowledge, *id.*, which turns on what a school "*must* have known," not what it "*should* have known," *Koon*, 50 F.4th at 407.

*Baynard* is no obstacle to John's suit here. While the *Baynard* principal might have inferred that a student sitting on a teacher's lap was at risk of sexual abuse, the risk was not obvious and the principal did not "actually draw[ ] the damning inference," *Koon*, 50 F.4th at 407. By contrast, Coach Findley's report that Murphy was engaging in "sexual grooming" of multiple student-athletes gave rise to a more obvious inference of abuse and, as John has alleged, an appropriate official in fact drew that inference. *See* Section I.B.

Also, in *Baynard*, the only report of abuse as explicit as the "sexual grooming" report from Coach Findley here concerned events "'too distant in time' to provide the school with actual knowledge of sexual harassment in its programs" in the present day, *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1153 (10th Cir. 2006). After all, a stale report says less about a teacher's current conduct than does a recent one. *Baynard* acknowledged a school may receive actual notice if it knows a teacher is currently abusing a different student, 268 F.3d at 238 n.9, which would make the present

26

danger to the plaintiff inescapably obvious. *See Broward*, 604 F.3d at 1257 (noting "no circuit has interpreted [the] actual notice requirement so as to require notice of the prior harassment of the Title IX plaintiff *herself*" and citing *Baynard*). But an allegation of abuse fifteen years before was insufficient to demonstrate the principal must have known, despite her denials to the contrary, that a teacher "was *currently* abusing a student," *Fairfax*, 1 F.4th at 265 (citing *Baynard*, 268 F.3d at 237-38 & n.9). In sharp contrast, John has alleged that the University received a report that Murphy was *currently* engaged in ongoing sexual misconduct that either constituted sexual abuse itself or made the risk of abuse so obvious that an official must have known—and indeed did know—about the present-day threat to students' federal rights. *See supra* Section I.B.

Besides, this Court has "cast[ ] doubt on whether all of [its] opinion in *Baynard* remains good law" in light of interceding precedent. *Forth*, 85 F.4th at 1054 n.7 (citing *Fairfax*, 1 F.4th at 265); *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 549 (7th Cir. 2022) (en banc) (Easterbrook, J., concurring) (similar). And *Baynard* is out of step with the law of this Court's sister circuits. *See Forth*, 85 F.4th at 1054 n.7. At the very least, *Baynard* must be read to accord with more recent cases like *Koon* that

27

make clear that, in rare circumstances like these, knowledge of a "danger[ ]" can provide actual notice, *see supra* p. 22—a standard consistent with Supreme Court Title IX precedent observing that "misconduct" falling short of actionable abuse may still put a school on notice of an obligation to act or risk liability. *See C.S*, 34 F.4th at 549 (Easterbrook, J., concurring) (discussing *Gebser*). Plus, a rule that a school cannot have actual notice until it knows of a specific recent act of sexual abuse is a recipe for disaster. By the District Court's telling, a school that knows its employee is about to sexually abuse a student may sit on its hands until the damage is done. That cannot be the law.

3. The District Court also wrongly dismissed the allegations about Murphy's internal reassignment as irrelevant. JA 43. In doing so, it failed to draw inferences in John's favor.

First, the District Court asserted that Murphy's "reassignment is 'merely consistent with,' and does not 'plausibly suggest[ ],' a violation of Title IX." JA 43 (quoting *Twombly*, 550 U.S. at 557). Putting aside the fact that John does not argue that reassignment, on its own, is enough to establish a "violation," *id.*, Murphy's reassignment, viewed in the light favorable to John, is more than "consistent with" the school's knowledge.

28

As described, the University redefined Murphy's scope of work in a manner that reduced his contact with the exact population to which Coach Findley had reported he posed a threat. That fit between Coach Findley's allegation and the University's action gives rise to an inference that the latter was motivated by the former, bolstering the plausibility of John's allegations that the University understood that Murphy posed a danger to male student-athletes. *See supra* p. 23.

Second, based on the year between Coach Findley's report and Murphy's reassignment, the District Court wrongly inferred the former did not cause the latter—an inference against John. JA 43. At this early stage, the District Court was instead required to construe inferences in John's favor. *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 440. And the District Court's interpretation of the delay between report and reassignment was not the only one available. Internal school sexual harassment investigations can take months, even years. *See, e.g.*, 85 Fed. Reg. 30,026, 30,056, 30,268 (2020). A delay between the allegation against Murphy and his reassignment, then, is no surprise, and does not foreclose a causative relationship. In discovery, the University might identify an

alternative reason for the reassignment. But John's allegations are enough for his case to continue to that stage.

## CONCLUSION

For the reasons explained above, the Court should reverse the judgment below and remand for further proceedings.

February 1, 2024                      Respectfully submitted,

                                      /s/ *Jim Davy*
                                      Jim Davy
                                      ALL RISE TRIAL & APPELLATE
                                      P.O. Box 15216
                                      Philadelphia, PA 19125
                                      (215) 792-3579
                                      jimdavy@allriselaw.org

                                      Alexandra Z. Brodsky
                                      Adele P. Kimmel
                                      PUBLIC JUSTICE
                                      1620 L Street NW
                                      Suite 630
                                      Washington, DC 20036
                                      (202) 797-8600
                                      abrodsky@publicjustice.net

                                      Kerstin W. Sutton
                                      KERSTIN WALKER SUTTON PLLC
                                      3215 Deerchase Wynd
                                      Durham, NC 27712
                                      (919) 698-9555
                                      kws@kwsutton.com

                                      *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 5,649 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

Dated: February 1, 2024          */s/ Jim Davy*
                                 Jim Davy
                                 Counsel for Plaintiff-Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2024, I electronically filed the foregoing brief of plaintiff-appellant with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

Dated: February 1, 2024          */s/ Jim Davy*
                                 Jim Davy
                                 Counsel for Plaintiff-Appellant